Edie Cunningham of the Federal Defender's Office on behalf of Mr. Zamastil, and I would like to reserve 5 minutes for rebuttal. As explained in the briefs, many errors occurred in this trial. I would like to focus on the plea negotiation involuntariness issue, the 404B and 403 issue, and the alibi instruction issue. But any of the errors could have impacted the verdict because the government's case was weak. Compelling evidence pointed to a third-party culprit, Larry Bates, who was still a free man. Fingerprint evidence shows that he was at the airport on the night of Shaner's disappearance at about the same time. He returned to Fort Huachuca that evening, where he was stationed, and he knew the fort like the back of his hand. His car was seen near Garden Canyon in the days just after her disappearance, and he has a history of sexual violence against women. But despite this compelling evidence, the government chose to prosecute Zamastil, even though it had rejected him as a suspect over two decades before. No physical evidence ties Mr. Zamastil to the crime. The government's case was built on prison informant testimony that easily could have been based on a widely disseminated news article, and also on Mr. Zamastil's admissions to the FBI and the government in the early 1980s. But the government had determined at that time that those admissions were not trustworthy because they were erroneous. So I would like to turn first to those admissions, because we contend they should have been excluded under Rule 410 as plea discussions with a government attorney, which extends to discussions with an agent with authority to negotiate, as Agent Doss was. Under the totality of the circumstances, the government and Zamastil were engaged in ongoing plea negotiations from at least September 1980. Each side had a specific goal. The government wanted information from Zamastil about his involvement and others' involvement. And Mr. Zamastil wanted a sentence concurrent to the life sentence he was already serving. That's the Wisconsin sentence? Excuse me? That's the Wisconsin sentence? Yes, Your Honor. What's the statute?  And he's serving a life sentence?   That's the Wisconsin sentence. And if he was serving a life sentence, what's the California sentence? He still has to serve those life sentences after he finishes his Wisconsin sentences. Are they imposed consecutive to the Wisconsin sentences, or are they concurrent with Wisconsin, do you know? I know he has to finish his time in Wisconsin if he ever does before he can get to California. That's my understanding at least. Well, I mean, if he's serving them concurrently, that doesn't necessarily, that doesn't necessarily true. That's true. He has consecutive sentence for the sexual assault in Wisconsin, so he has to finish the life sentence. Well, it sort of, it doesn't say anywhere, but it seemed like it might be a possibility that, you know, sometimes when, you know, if you're a high achiever of murders, that as your client could be determined, that if he had, if he were going to be eligible for parole on the other ones, if they were concurrent sentences, it kind of looked to me like that might have been why they decided to prosecute him on this. Well, Your Honor, the ins and outs of that are hard to determine, but I think it's extremely, extremely unlikely that he'll be getting out of prison. I think that's a hypothetical possibility at best. So we don't really know, and it's not in the record about the California with the brother and the sister, right? Yes, Your Honor. Is that, I couldn't tell from the record, there was an indication about him killing a man by a fence. Is that, that's not the California murders of the brother and the sister? No, it's not. Did he ever get prosecuted for that one, the man by the fence? Well, that was one of the cooperating inmates' stories that Zanistel killed a man and left the body by a fence. That was, I mean, that was the, basically the story that Doe, too, told Agent Besser. So we don't know whether that's the brother or if that's? Well, that was used as evidence in this case as proof that he killed Shaner even though it referred to a man. It's our duty to get this case right no matter what, but I'm just trying to, as a practical matter, does it make any difference to Mr. Zanistel one way or the other if this is reversed or not? Although he walks a little prouder in the Wisconsin prison maybe, but I mean, is it? Well, our judgment is he's wrongly convicted of this crime. I understand. I said at the beginning. Technically, it probably won't affect whether he gets out of prison, but it also is very important because I think there's this very strong possibility that the wrong person was convicted and the right person is still out there walking the streets. Fair point. As we deal with incriminating statements, which seems to me that that's the issue you've started out with, I review really what the district court did there for clear error, don't I? Well, we contend that he used the wrong legal standard. Well, I understand what you say he did on the standard, but whether you engage, whether you allow, whether somebody was in plea negotiations or not is a district court decision, and I can't undo that unless I have clear, unless I find the district court clearly erred. Well, you reviewed DeNovo, Your Honor, whether he used the correct legal standard, whether he had the correct understanding of what plea negotiations, in fact, are. That's United States v. Hinson. So I think we're under DeNovo review. And typically, when you're looking at the totality of the circumstances and you're drawing from that totality whether something comports with a legal standard, that's DeNovo review, Ornelas, involuntariness, all of those things. So here we're not dealing with disputed facts. The facts are not in dispute. His factual findings on this are reviewed for clear error, but the facts aren't in dispute. We're discussing whether or not what happened constitutes plea discussions, and I believe that's reviewed DeNovo. Well, but I guess I disagree, but I'll give you that point. And let's move to the second point. Isn't it so that a June 30, 1981, letter from your client's attorney to Butler, which wasn't admitted at trial, states that your client has requested that you be advised, now Butler, that he does not wish to enter into negotiations with you at this time? Isn't there such a letter? Yes, Your Honor. And that this letter was dated over a month after your client's May 20 letter to Butler. There are a couple of issues that I'd like to address with that. First of all, the district court found that by May 28, Zanistel had a reasonable belief that he was engaged in plea negotiations. So whatever happened after that really doesn't matter. Also, Zanistel. Well, I guess it doesn't matter if you're really trying, if you're not trying to understand whether the district court clearly erred or not. My worry about this is this. This letter, written a month after his May 20 letter to Butler, says that Zanistel doesn't consider himself to be in plea negotiations. And what we're really trying to determine here is, did the district court make a correct determination to admit some evidence and not admit other evidence? I would like to talk about the circumstances of what went on, because I think that those demonstrate that he was engaged in plea negotiations. And one very important circumstance is that every time Doss talked to him, Doss asked if he would give information for the limited purpose of communicating it to prosecutors so that they could evaluate whether to give him a concurrent sentence. So what else was he supposed to think but that he was in plea negotiations? But even if it's not, that is a very, very influential promise, as indicated in the authority I submitted this week, United States v. Law. And Doss candidly admitted at the suppression hearing, he told Zanistel that was the only use that was going to be made of the statements. That's a very influential promise, especially when you look at the context of what's going on here. Zanistel wants a concurrent life sentence. Why else would he want it? He wants to avoid the death penalty. So it's involuntary, and it violates the scope of using the statements, violates the scope of the arrest waiver paid by Doss. I'm having a tough time understanding why the interactions between Zanistel and Doss weren't similar to those in Guerrero. Well, I mean, Doss didn't make any coercive promises. He said he didn't have the authority to make the promises. Well, he said that initially. He didn't promise any leniency. At most, Zanistel speculated that cooperating with Doss would have a positive effect. Doss never said anything of that. But he told Zanistel that he would use the statements for the limited purpose of allowing prosecutors to evaluate whether to give him a concurrent sentence. And that is a very, very powerful promise. Was your client unfamiliar with the system? I can't think that. So he has to know what's going on. His prior convictions show he's familiar with the system, including weighing in favor of voluntariness or not. So I'm having, I mean, frankly, what you're really suggesting me to do is second-guess the district court. And so I'm trying to put you on notice, these are problems I have doing that. I understand. But let me give you a couple of reasons why I think you should consider our position. First of all, the district court's ruling turns the plain meaning of the word negotiation on its head. Blatt's Law Dictionary defines negotiation as communications with a view to an agreement. Certainly, at least by September 1980, the government and Zanistel are going back and forth. The government wants information. Zanistel wants a concurrent sentence. Butler himself, in October 1980, tells Zanistel, I'm considering a negotiated agreement for a concurrent sentence. What weight and what's the case law to support what a person's state of mind about what they're doing? You know, because you keep talking that that's what Zanistel thought that he was doing. What are the cases that say that, but what if Doss doesn't think that's what they're doing? Or what if Doss thinks that's what they're doing, but Zanistel doesn't think that's what they're doing? What does all that matter? I believe this case is controlled by the district's president in Siacom. And I would ask the court to look very closely at that, because in Siacom the defense said, I want to meet with a government attorney because I'm afraid I'm going to be charged. And so the government attorney says, okay, I'll meet with you. She spills her guts, tells her version of events, before the prosecutor even indicates that he would even think about a plea. And this court held that that was plea discussions. I don't think there's any way to square what the district court did in this case. Did this court hold they were plea discussions without considering what the district court had done? No. No, it didn't. No. In fact, the district court made the same determination. And so, again, we're at the clear air abuse of discretion standard. Well, I have a couple of other points to make. One is that the district court found that the government was involved in direct negotiations with Zanistel in October 1980. He made that finding on ER 9. The district court found that the government was engaged in negotiations, was engaged in plea negotiations in February 1981. He made that finding. How is it that one party is in negotiations and the other party isn't? So those May letters should not have come in. Okay, go ahead and finish your sentence. Oh, I was going to move on to another issue because my time is running short. Let's suppose, I guess at some point we all agree there was a negotiation. Yes. Okay. And Judge Zapata penned it at one date. You want to move it earlier. Let's suppose we say we agree with you, at least in part, that the interview with Doss in October of 1980 really is when the negotiations were underway. And I say that because that was the interview that immediately followed Bates Butler's invitation to provide more information. Yes, Your Honor. Suppose we agree with you and say what was said in the October 29, 1980 interview should not have been received as evidence. Not because it was involuntary, but because it was part of negotiations. Okay. What would be excluded by that? What came in that shouldn't have come in? His admissions to being involved in the homicide, his admissions that the body was left on a piece of desert. Also, the May 1981 letters, because they were linked back to what happened in October. They were linked back to Butler's letter to him in October, saying you want information, I'm ready to give information. And also linked back to the prior interviews with Doss in October. And in those letters, that's the first time he uses Lisa Jo Shainer's name. That's where he says eight years is long enough to keep this in my nightmares. That was the centerpiece of the government's opening and closing. And, of course, Lisa Jo Shainer. The October 29, 1980 interview. Excuse me? The October 29, 1980 interview. Well, the May letters were linked back to the October letter. They were in response and in part of the negotiation process from October. What May letters? May of when? May 1981 letters. There's a letter from Zanistel to Doss and Zanistel to him. Okay. But I'm saying if we go from 10-2 forward instead of 281 forward. Yes. Those October letters would be encompassed in the period. They were going from 10-80 forward because the meeting with Doss and the letter from Butler was in 10-80. But the May 81 letters are out anyway, right? No, they're not. I thought Judge Zapata said from February 81 on. No, no. This was very, very odd. Zapata said the government was engaged in negotiations in February 81, but he said that Zanistel wasn't until Doss read the letter from Noss, the U.S. attorney, to him at the May 81 meeting. And the May 81 meeting happened at the end of May. The May letters went out May 20th. So, curiously, the district court allowed those letters to come in. You wanted to reserve five minutes, and I see you're down to just about five. I do want to just quickly touch on other important issues in this case before I sit down so that I can address them on rebuttal. The 404B evidence. The Johnson murder was led in to show identity. The district court used the wrong legal standard. The district court said the similarities outweigh the differences. That is not the standard for identity. The standard for identity is whether the similarities are sufficiently distinctive to warrant an inference that only the same person could have committed both. There is no way to square what the district court did with this Court's precedents in Perkins and Luna. And I would ask the Court to take a careful look at that. Also, the 403 rulings, the graphic descriptions of Johnson's injuries had nothing to do with Shaner's case. And there was no objections, but that's plain error, right? There was a 403 objection. There was a 403 objection. And under this Court's precedents, en banc precedent in Curtin, it is the district court's obligation to carefully limit extrinsic evidence to make sure that the undue prejudice does not result and that it is necessary, actually, to the case once the defendant makes any 403 objection. But when you challenge that they're not similar, doesn't that just call everything into question because then they need to, you know, part of the more graphic part is showing that she was raped, right, and all of that. And you're saying they're not similar. And so it's really important to show that she was raped. Well, this is different, Your Honor. If we went on the 404B argument, the murder doesn't come in at all. We're concerned about the murder coming in because murder can't come in under 413. It can only come in under 404B. But, no, the rape, there's no dispute that Johnson was raped. We have his conviction records that went into evidence. But we don't know anything about the injuries to Shainer when she – when or if she was raped. We don't know that those injuries that Johnson suffered were anywhere – anything like what Shainer suffered. And there's also the issue of – So what did you argue in the case about why the Johnson murder didn't show he was the person that committed the Shainer murder? What did you argue in the case? Did you argue that they weren't very similar? We argued there were differences, but we had to because the murder shouldn't have come in under 404B. We were left to argue that. So if the murder should have come in, then you can't really argue that the government's hands have to be tied on not showing they're similar, right? Well, Your Honor, if the murder hadn't come in under 404B, as it shouldn't have, then there would be no need to differentiate it. I want you to save your time. Thank you, Your Honor. Thank you. But I would like to address the alibi instruction. You've got two minutes left. You can do whatever you want. I'll do that, Your Honor. Morning. Good morning. May it please the Court, I'm Bob Vestal from the U.S. Attorney's Office in Tucson on behalf of the United States in this case. And Judge Zapata did not clearly err in finding that there were not negotiations going on in the meetings between Doss and the defendant. What was wrong with the Doss and the defendant was the typical Doss tells the defendant in the first interview, I can't make any promises, it's not up to me. I'm with you. Okay. Until Bates Butler writes his letter inviting more information in aid of a possible result. Okay. So the Butler letter is in October of 1980. Right. And then 20 days later, Doss follows up. Right. And at the time that that was, I don't think Judge Zapata clearly erred in finding that he found that Butler's letter was so conditional that it was not the initiation of negotiations. And with that letter that talks about I'm not going to buy a pig and a poke. I need to, before I can negotiate with you, I need to know where we stand. Isn't that in itself a negotiation? I mean, what is it? I don't think that's plea negotiations. Plea negotiations don't start out with an agent reading somebody in their Miranda rights. Well, that's another thing. I've got your brief here. Okay. Your brief says defendant stated that he would waive his rights for the limited purpose of providing additional information. That was when Doss came to see him after the Bates Butler letter. Okay. What was the limited purpose? I don't, he didn't say limited purpose. He said limited information. No, I'm reading your brief. Right. Your brief on page 14 says defendant stated that he would waive his rights for the limited purpose of providing additional information. What's the limited purpose? The limited purpose is providing information. For what purpose? To see if he could enter into negotiations. In other words, the government was telling him what both Butler and Knauss were telling him. What other purpose would it have been? I mean, if it's just for information, does that mean it can't be used for any other purpose? I don't think that means that because Doss can't make that promise. Okay. But what's the limit? The defendant can't place it. What can't they do with the information? If it's limited, what can't they do with it? What's the limit? What my argument is, is the defendant cannot unilaterally limit how information is going to be used. Well, then what's the, if he says I waive my rights for a limited purpose and you say okay, then what's the limit that they can use it for? They can use it for, as he was told when he was read the Miranda Rights that day, they can use it against him. And if he says, as you seem to agree, that it was limited, there really wasn't any limit? Correct. His way of limiting the information is not talking. It's not saying, oh, I'm going to tell you something, but you can't use it against me. He can't do that. So if you say you have the right to remain silent, we can use it against you, and he says I will do it for the limited purpose and you apparently agree to that, there really is no limit. It's an illusory limit. I'm saying that he was in a situation with an agent who had told him I can't make you promises. And to the extent that he's trying to limit it, even if that's assuming that's what he's wanting to do, that is ineffective. If he wants to limit what he discloses to the government, he keeps quiet. He doesn't say, oh, I'm going to say something, but I want you to keep it secret. That's, he can't do that. If he's given his rights, he understands his rights, and he gives information. Are you saying that is an unequivocal waiver and the guy says I will do it for the limited purpose of providing information? I think the fact that he provided the information without any assurance from the person he was talking to, and, in fact, he has the assurance that the person he's talking to can't give him the immunity he requests, that, yeah, that is unequivocal. Suppose we disagree with you about that. Suppose we were to hold that when an officer or an agent shows up in response to a, when the prosecutor says I want to get more information and the guy says, okay, I'll do it for that limited purpose of following up on that letter. Suppose we were to hold that were the, that was the start of the negotiation, okay, by my premise. Okay. Then what was said on October 29, 1980 should have been excluded as statements made in the course of negotiation, right? If you, if I accept your premise. Okay. What would, do we have any harmless error there or is that, were the statements made so, so significant that we couldn't find anything harmless? I think we probably could find harmless on the. But it could not, I didn't hear you, I'm sorry. Excuse me? Did you say we could or could not? You could find it harmless. You could find it. And if you look at the October 29th, what he, what he said on the October 29th is he reiterated he was a participant in a homicide in Tucson, again, so he's just, that's just a repeat of what he's already said. He did provide information about two other participants and. As far as the first point, where did he, when did he previously say he was a participant in a homicide in Tucson? That was in his first interview with Doss, I believe. Date? September. Five?  He told Doss that he had been participating in a homicide in the Tucson area in May 1973. That's, that's the 2014 to 2015. Right. So that's just a repeat. The fact about the other two individuals involved isn't really material to this case. That was the new information he provided. Has he, so, and then to go back to your premise, there's one more point I do want to make to show your premise is not actually correct. At the 1029 interview with Doss, Doss tells the defendant that the prosecutors need more info before they decide what, any immunity or consideration they would offer. Again, they're telling him, then he's not saying what you're going to tell me is immunized. He's saying they need more information to decide whether to negotiate with you. I agree with you that they didn't have a deal. I'm not clear they were doing the dance of negotiation in aid of a deal. Right. The prosecutors were not negotiating. They made it very clear at each step of the way that we're not going to negotiate until we have more information. You can't, the defendant can't negotiate unilaterally. There has to be two parties in the negotiation. If one party says we're not going to talk about plea negotiations until we know what's going on, there aren't plea negotiations going on. And, you know, kind of look at the totality of the circumstances. You've got this is all going through an agent who is communicating to the prosecutors. The, you kind of, again, look at it to show that even in Doss's mind, they're not engaged in negotiations at that point. On the May 20th, 1981 letter to Butler, the defendant says, I will await a letter from you as to whether you will deal with me. Again, there's no negotiations going on because he understands he has to give enough information to open negotiations. The information was a conditioned precedent in any negotiations, basically. And Judge Zapata clearly did not err in making that conclusion based on this record. What about Justice Cunningham's point that the other prior acts were not sufficiently similar to be admissible, basically to be probative? Okay. Again, this is an abuse of discretion area. The judge found, Judge Zapata found that the acts were sufficiently similar. And what he specifically identified, and I kind of the way. Did you try to introduce other acts besides this, the rape murder? Yes. And that was not allowed? Yeah, the government tried to introduce also the California murder, thinking that that was similar enough too. And Judge Zapata said. That's the brother and the sister? Yes. And Judge Zapata said, no, that's not similar enough. Whereas he concluded that the Wisconsin murder was similar enough. And, you know, probably the best way I think to practically look at the similarities is think of it as kind of a funnel that's narrowing down to a point. You've got the defendant. Okay. There's a rape. There's a rape and then a murder. There's a rape and then a murder with a, the murder done by the relatively noisy implement of a gun as opposed to strangulation of something. You've got the rape and murder with a gun of very similar victims. You've got the rape and murder with a gun of similar victims that had been abducted from a public parking lot. You've got all of that with the victim taken to a relatively remote area. You've got the kind of, to the extent you're looking for some kind of signature, I think it's the bullet embedded into the ground underneath the victim. And then you've got the body of both victims being left nude. All of those facts, that really narrows that funnel down to a very small universe of people who it could possibly be. Well, then you'll admit there were differences, lowering the probative value. But what you're really saying is the similarities, abductions in the parking lots, the victim's body being left nude, raise the probative value. Right. And further, there was a limiting instruction given, wasn't there? Yes, well, when the evidence was introduced in at the end of the case. And further, the rape testimony was not presented in an emotional manner. In fact, it came in through the doctor's testimony, didn't it? Yes, that's correct. Was Larry Bates ever definitively excluded as the killer? The FBI believed that he was not the killer. Agent Ralph testified, and I'm not sure if it was in a pretrial hearing or a trial, but it's somewhere where Agent Ralph testified that his fingerprint was on one of the parking tickets. And that parking ticket, Agent Ralph concluded, was not that he would have exited the parking lot before the victim got there, actually, based on the timing, basically. So that's an end. Unlike the defendant, Bates never made multiple confessions to the crime. Neither of them, they were all checked. He was never really definitively excluded, right? It's not like his DNA didn't match or something like that. This is a judgment call. Well, there was no, they did do all the forensic that they could, and he didn't, as the defendant, he didn't meet any of that. Your counsel for the defendant or appellant in this matter said that there was no physical evidence that tied Mr. Zalmistil to the crime. Is that a correct statement of the evidence? Yes. But there was enough evidence to corroborate what he confessed to. Now, what about her argument that I was questioning her about, which had to do with, they're also saying that the more inflammatory nature of the rape that happened to Johnson, you know, should not have been introduced. What, how do you, she said it was objected to. She said an objection was preserved. I had asked her, well, where is the objection? And she said it was in the emotion and lemony. Do you think it was observed? What's the standard of review? And in terms of, I was asking her in terms of if you're challenging the similarities, then why, you know, why should the prosecution have the arm tied behind his or her back, the prosecutor, if you're saying they're not similar, but whether there was a rape is an important component of whether they are similar. Right. That's a great point. I believe it was objected to, quite frankly, except where I specifically identified in the brief that they didn't make an objection. They, the trial attorney pretty much objected to everything. He made every objection he could make, pretty much. So I think it was objected to. But I think to the extent that it's being offered for similarity and modus operandi in a furrowed court, you have to get into some detail, certainly. Otherwise, it just. Well, she said there was no question that there was a rape because of the convictions. Is that, is the nature of the convictions enough to say the prosecutor, like, you know, say for example sometimes people, you know, a crime involves possession of, you know, as a felon with a gun, and people want to stipulate to certain parts of it, but then they're not stipulating to everything that the prosecutor has to prove. What did they offer to stipulate to that you wouldn't go into? I don't remember anything in the record about the stipulation, Your Honor. What I think it was important, again, for similarity purposes, is you wanted the detail that the, essentially the rape occurred in the isolated area where the victim was killed with the gunshot, with the bullet embedded into the ground. Those details were all what made it probative as to this case. And those details, that's why those details were relevant. So they're probative and prejudicial, your argument would be they're prejudicial in the sense that it's not good evidence for a defendant, but that they're probative and prejudicial doesn't mean the same thing. Right. Probative always prejudicial. And the judge found that specifically. And in addition, you know, when you're talking a rape or murder, I mean, it's going to be prejudicial. The question is, did the court, and the court did limit it to make it sure that only the relevant material came in, and that's what came in in this case, and that's why there was no abuse of discretion. May I ask you the same thing I asked Ms. Cunningham? Do you know what the practical situation is? Is he doing consecutive or concurrent terms vis-à-vis Wisconsin and California? My understanding, Judge, is the reason our office, one of the reasons our office pursued the case, is there was some concern that he could get out, you know, either true parole or whatever. So that was one of the reasons, that that at least was a possibility. So my question is, do you know whether they are consecutive or concurrent? I can't tell you that right now. I believe all conviction documents are in the record, though, so that should be clear. I did not find the California documents. If you're worried that he's going to get paroled, they had to be concurrent. I would imagine so, but, again, I can't represent that to you. I'm sorry. Well, I didn't find them in the record either, so. Okay. I'm sorry. As far as I know, Ms. Cunningham said she wanted to talk about alibi in her rebuttal. Well, there was the defendant did not present enough evidence to justify the alibi instruction, and in any event, I believe it was harmless error, and I think this Court's earlier conclusion in the Hairston case that failure to give an alibi instruction is always reversible error does not survive the Netter case of the Supreme Court, actually, where the Court held that jury instructions, jury instruction errors can be harmless and not, and they talked about the limited nature of per se reversal. So unless the Court has any questions on that. I have none, I think. Thank you. Thank you. Ms. Cunningham, back to you. I'll have to move quickly, but I'd like to address several points. First, to your point on if plea negotiations began in October 1980, the error would definitely be harmful because of the May 1981 letters that did come in that were the centerpiece of the government's opening and closing. Eight years is long enough to keep this in my nightmares. Lisa Jo Shaner's name. Okay. But counsel's point is that on September 5th, he did admit that he had participated in a May 73 homicide and that he used a gun, and so that even if we start the negotiation clock at 10-2, these would have come in. Well, the government focused very highly on the fact that Zanis still used the name Lisa Jo Shaner in the May 1981 letters. She emphasized that several times in her argument. That was critical. And it never came to the jury's attention that actually the U.S. Attorney's Office had provided that information to Zanis still in February of 1981. So I think for that reason alone, if you find negotiations began in October or even in February, the conviction has to be reversed. And also, you were speaking about the limited purpose for which the statements were to be used. That statement by Doss vitiated the Miranda warnings. The Miranda warnings can mean nothing once Doss tells the defendant that his statements are only going to be used for a limited purpose. And Doss told him that, or did he tell Doss that? He told Doss told him that. Doss told him that, and he candidly admitted that on page 409 of the excerpts of record when asked by the prosecutor. As to 404B, again, the district court used the wrong legal standard. The district court used the legal standard applicable to whether evidence comes in for intent or knowledge under 404B. When we talk about Miranda, I thought you also admitted that the research has not revealed that a Miranda case in a similar posture to this theory. I mean, I got that right gray brief, 32. But it's clear from what happened. Well, I understand your argument. I'm just trying to say if I adopt what you're saying about Miranda, there is no case that says it. You're just saying we have a similar we have an argument to be made, but there's no case that has a similar posture to the argument we're making. Well, and I think that that's the reason for that. That's what you said on gray 32. Well, I also said that prosecutors would not try to use statements when the agent has so clearly limited the use of the statements. And I think the law case does speak to this situation because the law case says once you make a promise not to use in prosecution, the Miranda warnings have no effect anymore. And you're over your time. Why don't you take 30 more seconds and then please wrap up. Sure. And I would like to just reiterate that the inflammatory details of the Shader rape of the Johnson rape were presented in a very inflammatory manner, both by the doctor and reiterated by the government in closing. Also, and they bore no similarity to what happened in the Shader crime. And I would also just encourage you to read especially the reply brief on the alibi instruction. Hairston does require reversal in this case. The government introduced evidence that the defendant said he was elsewhere at the time of the offense. And even if you – it's not clearly irreconcilable with Nader and even if it were, it's harmful in this case because of the weaknesses in the government's case. Thank you, Your Honor. Thank you.    Thank you. Thank you. Thank you. Thank you.
judges: Silverman, Callahan, Smith